# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 9, 2013

## STATE OF TENNESSEE v. TOMMIE PHILLIPS

**Appeal from the Criminal Court for Shelby County**
**No. 09-05231      W. Mark Ward, Judge**

---

**No. W2012-01126-CCA-R3-CD - Filed December 13, 2013**

---

The defendant, Tommie Phillips, was convicted by a Shelby County Criminal Court jury of four counts of first degree felony murder, one count of reckless homicide, two counts of attempted first degree murder, one count of aggravated rape, one count of aggravated sexual battery, six counts of especially aggravated kidnapping, and two counts of especially aggravated burglary. The trial court merged the four counts of felony murder and one count of reckless homicide into one felony murder conviction and merged the aggravated sexual battery conviction with the aggravated rape conviction. The trial court also merged the six counts of especially aggravated kidnapping into three convictions – one per victim – and merged the two especially aggravated burglary convictions into one conviction. He was sentenced to an effective term of life imprisonment plus sixty years. On appeal, he argues that: (1) the trial court erred in denying his motions to suppress his statement to police and the photographic and subsequent identifications of him as the perpetrator; (2) the trial court's erroneous jury charge on especially aggravated kidnapping deprived him of a fundamentally fair trial; and (3) the evidence is insufficient to sustain his convictions. After review, we remand for entry of a corrected judgment in Count 14 to reflect the sentence length of twenty years, which was omitted, and we vacate the judgment for especially aggravated burglary in Count 16 and remand for resentencing for the modified conviction of aggravated burglary in that count. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Vacated in Part, and Remanded**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); and Gerald D. Skahan and Robert H. Gowen, Assistant Public Defenders (at trial), for the appellant, Tommie Phillips.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Patience R. Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was charged in an eighteen-count indictment with four counts of first degree felony murder, one count of first degree premeditated murder, two counts of attempted first degree murder, two counts of aggravated rape, six counts of especially aggravated kidnapping, and three counts of especially aggravated burglary, as a result of his multiple actions against multiple victims on December 9, 2008, in Memphis.

### State's Proof at Trial

M.L.[1] testified that on December 9, 2008, she lived in Memphis with her eighty-five-year-old mother, F.G.; son, C.L.; and daughter, M.J.L.  M.L. planned to go to her job at the post office that day and usually left for work around 12:30 p.m.  M.L. and her mother were hanging curtains for Christmas when M.L. realized, at 12:20 p.m., that she was going to be late for work.  She went into her bedroom and put her lunch bag on her bed, where her work clothes and phone were already sitting.  M.L. got into the shower and had been in there for about ten minutes, when she heard someone open the bathroom door and say, "[G]et out of the shower."  Thinking it was her son, M.L. responded, "[W]hat did you open the door for, you know I'm taking a shower," and continued to shower.

M.L. testified that the voice again commanded her to get out of the shower and that fear came over her as she realized it was not her son. She saw a man wearing a white bubble coat with the hood up and pulled low so that she could only see his nose and mouth, and he had a sawed-off shotgun pointed at her. She turned off the water and got out of the shower, naked.

M.L. recalled that the intruder told her to put her robe on and come out.  She complied, wondering how the man got into her house.  As she came out of the bathroom, she

---

[1] It is the policy of this court to identify victims of sex crimes only by their initials.  To further protect the identity of the victim, we have used initials to identify the victim's family members, who were victims themselves of other crimes committed by the defendant.

-2-

felt a draft and noticed that the window air conditioner had been removed, the curtain was halfway down, and her night stand had been pushed away from the window and everything had been knocked off it. She, therefore, surmised that he had entered through her window. The intruder asked if anyone else was in the house, and she responded that her mother was. He asked where, and M.L. told him that her mother was in her room. He told M.L. to go get her, and she went down the hallway to her mother's room and went in. Her mother asked, "[W]ho is that?" and M.L. told her not to panic.

M.L. testified that the intruder ordered her to take her mother "to the back," and they went into M.L.'s bedroom and sat on the bed. The intruder demanded their money and expensive jewelry. M.L. told him that she did not have any expensive jewelry or money, aside from the ten or eleven dollars that she had. He insisted that she had money because of the vehicles she and her family members drove. She offered to go to the bank and withdraw what money she had.

M.L. testified that the intruder told her to pull the drawers out of her dresser, which she did until he ordered her to stop. He then ordered M.L. to take her mother back to her bedroom. Once there, the intruder ordered her to tie her mother's hands and feet with some shoelaces, and M.L. complied. The intruder told M.L. that he was going to separate them, and he ordered her to go back into her bathroom, take off her robe, and get into the bathtub. Once she was in the bathtub, the intruder bound her hands with some tape that he grabbed off her VCR and bound her feet with a belt.

M.L. testified that, after she was bound, she heard things falling all over the floor in her bedroom and saw the intruder throwing things out of her drawers and ransacking the house. She heard him in her mother's room, going through her jewelry box and knocking things onto the floor. The intruder then returned to the bathroom and asked where her son kept his clothes. She called to her mother to tell him where the clothes were and then heard scissors as if the intruder were cutting up the clothes.

M.L. testified that she heard the intruder talking, like he was on the phone. She heard him say, "I got your momma and your grandmomma. . . . You got thirty minutes." The intruder returned to the bathroom, and M.L. asked him if her son owed him money. He told her that her son's friends, "Main and Nick," had robbed his friend the night before and that her son was "going [to] be the pawn for it." The intruder left the room and continued to rummage through the house, and then she heard him get on the phone again and tell whoever was on the other line that he had fifteen minutes. M.L. estimated that the intruder had been in her home for about an hour.

M.L. testified that the intruder came back into the bathroom and, grabbing her head,

-3-

forced her to stand. The intruder "took his fingers and he stuck his fingers up in [her] vaginal area." She noted that he was wearing gloves. She pleaded with the intruder not to rape her, saying that she just had surgery. He pushed her back down, "rubbed [her] across there, and he said, oh, that feels good[,]" and left the bathroom. She noted that her hands and feet were still tied, and the intruder had the gun with him the entire time. When he came back into the bathroom, he had taken off his coat. She did not recognize him and said that she had never seen him before that time, but she identified the defendant in court as the perpetrator.

M.L. testified that, upon returning to the bathroom, the defendant said that he now had two problems: they had seen his face and he had to kill them. He left the bathroom again, and she saw him pouring dishwashing liquid on the floor of her bedroom. He came back into the bathroom, saying to himself, "I'm getting paranoid, getting paranoid now, I got to show him I mean business[.]" He left the room again, and she heard him tell someone that he had ten minutes and then heard him talking to what sounded like somebody else, saying that he was "going to kill his momma and grandmomma and Chris and Main and Nick, too." M.L. sat in the bathtub, terrified and praying. She asked the defendant if he had called her son, and he said that he had. She said that her son would have been there by now or called the police.

M.L. testified that the defendant came back into the bathroom with a knife. She said to him, "[Y]ou just told my son he had ten minutes. . . . [I]t hasn't even been two minutes." The defendant replied, "I got to show him I mean business." He stepped behind her in the bathtub and said, "I'm going to cut you right here." She put her face down when he started to cut her, which kept him from cutting her throat but not from cutting her. She tried to trick him by telling him that he had cut her throat and that she could not breathe, but he did not believe her. He pushed her head back and then stabbed her, digging into her chest. She was screaming, and she heard her mother calling out to her. She tried to reassure her mother. The defendant was about to stab her a third time when she threw up her arms and he stopped.

M.L. testified that blood started pouring from her wounds, and she lost control of her bladder and bowels. She felt her body getting weaker and shutting down. The defendant stepped out of the bathtub, smiled at her, and went back into her bedroom. Knowing that she had to stop the bleeding, M.L. grabbed a soapy rag from the bathtub to try to stop the blood that was "pouring out of [her]." The defendant came back into the bathroom, threw her bathrobe to her, and said, "[P]ack it down, you'll live." He told her that if her son arrived in fifteen minutes, he could call the paramedics to save her. He said, "I do this all the time," then smiled and left the bathroom.

M.L. testified that she was still in the bathtub with her hands and legs bound, and she tried to ball up the robe and put it on her shoulder and the other places she was bleeding. A

-4-

few minutes later, she heard her mother scream, "[P]lease, don't kill me." M.L. called out to her mother, and the defendant told her, "[S]hut up or I'll kill her." She called out to her mother again and got no response. After that, M.L. heard the defendant walking around the house.

M.L. testified that, after hearing the front door open about ten minutes later, she heard C.L. say, "[M]an, what you doing in my house," then heard "some tussling," and knew the two men were fighting. M.L. was able to loosen her bindings and slowly get out of the bathtub. She went into her bedroom to try to get a phone to call 911 and then into the kitchen where she found one. However, the defendant had disconnected the phone line.

M.L. testified that she went back into the bathroom and heard the defendant command her son to bind himself. She tried to put the phone back so the defendant would not see that she had tried to call for help and kill them all. The defendant saw her and trained his gun on her. He accused her of calling someone, but she denied it. He tested the phone to see if it had a signal and, as he did so, she tried to back into the bathroom. He stuck his gun in the door to prevent her from closing it. The defendant cocked the gun and pulled the trigger, but it did not fire. He tried two more times, but the gun did not fire. He stuck a knife through the door while M.L. held the door, trying to keep him from stabbing her. The defendant moved the gun out from the door and said, "[Y]ou just killed your son" and went into the kitchen.

M.L. testified that she heard her son screaming and begging for his life, so she went down the hallway pleading for her son's life. The defendant picked up his gun, which was on the floor, and ordered her into the hall bathroom. She saw her son lying on her mother's bed, bound and bleeding, and the defendant stabbing him. In the hall bathroom, M.L. saw her mother lying unmoving on the floor with her head between the commode and the wall. She asked to go back to her bathroom to relieve herself, and the defendant walked her to her bathroom at gunpoint.

M.L. testified that the defendant went back to stabbing her son. She saw a hammer sitting on her dresser, so she picked it up and went back down the hallway. She went into the room where the defendant was with her son, and the defendant trained his gun on her and ordered that she put the hammer down. She kept walking toward him with the hammer, begging him not to kill her son. Her son was on the floor.

M.L. testified that she then saw her daughter, M.J.L., stick her head in F.G.'s bedroom door and scream. C.L. told M.J.L. to run, and the defendant ran after her. M.L. heard M.J.L. fall and the defendant commanding her not to move. M.L. saw C.L. work his way loose from his ties, and he jumped up and went into the living room behind the defendant. C.L. and

-5-

M.J.L. attacked the defendant from both sides, and M.L. advanced and tried to hit him with the hammer. The defendant slung C.L. and M.J.L. from side to side, but C.L. managed to get the front door open and the struggle spilled out onto the porch. C.L. collapsed on the porch, while M.J.L. kept a hold of the defendant's shirt and M.L. tried to hit him with the hammer. The defendant pulled out of M.J.L.'s grasp and jumped off the porch. With a smile, the defendant said, "[H]ey, main, I'm gone" and ran down the street.

M.L. testified that she collapsed onto a chair in the living room and told M.J.L. to call 911. M.J.L. asked M.L. if the defendant had raped her, and M.L. said, "[N]o." M.L. told her to go check on her grandmother, and M.J.L. reported back that her grandmother appeared to be dead. M.J.L. ran next door and returned with a neighbor, Vella Powell, to help. M.L. said that she thought that she was dying because she felt herself getting weaker and weaker and was barely breathing. Paramedics arrived and took her to the Regional Medical Center, "the Med," where she spent four days. While at the Med, police visited her and showed her a photographic array, from which she identified the defendant as her attacker.

On cross-examination, M.L. acknowledged that one of the crime scene photographs of the interior of her house showed a bag of marijuana near a jacket that belonged to C.L. but said that the marijuana did not belong to him. She said that, prior to the day of the incident, she had never seen the defendant, even though he had apparently been to the house with C.L.

On redirect examination, M.L. stated that she was stabbed twice and cut across her face and chest. She reiterated that she felt her body shutting down like she "was just barely there."

C.L. identified the defendant in court. At the time of the incident, he had known the defendant for about three and a half or four years through mutual friends known as "Nick and Main," who were the victims' neighbors. C.L. testified that he got home around 2:30 p.m. the day of the incident and saw the defendant standing in the dining room. He did not recognize the defendant immediately but realized who he was when they "began to tussle." The defendant hit C.L. in the head with his gun. C.L. asked the defendant why he was doing what he was doing and if he wanted money. The defendant said that he wanted money and made C.L. kneel at the foot of his grandmother's bed. He took C.L.'s keys and cell phone. He then bound C.L.'s feet with a belt and ordered him to bind his own hands with another belt. The defendant also "gagged [his] mouth."

C.L. testified that the defendant heard M.L. trying to call the police and went to stop her. When the defendant returned, he was armed with a knife and told C.L., "[Y]our mother just got you killed[.]" The defendant put down his gun and began stabbing C.L. in the back. C.L. rolled over, and the defendant stabbed him in the chest and arm. When C.L. tried to

kick the defendant away, he stabbed him in the leg.

C.L. testified that he heard his mother moving again and that the defendant went to see what she was doing. C.L. heard the defendant "cocking" the shotgun, apparently trying to shoot her but the gun did not fire. While the defendant was with M.L., C.L. saw his sister, M.J.L., at the door. M.J.L. screamed and ran, but she fell down as she was trying to get out of the house. The defendant caught her, and they began to struggle. C.L. was able to free himself and ran into the living room to help his sister fight the defendant. He saw his mother, armed with a hammer, coming toward the defendant, but she could not "get a good shot at him[.]" C.L. managed to open the front door, and the struggle spilled out onto the porch. He "flip[ped]" the defendant off the porch, and the defendant ran away, saying, "[I'm] gone."

C.L. testified that the defendant stabbed him thirteen times and that he spent five days in the hospital due to his injuries. Police visited him in the hospital and showed him a photographic array, from which he identified the defendant as his attacker. C.L. maintained that the marijuana found in the house did not belong to him.

On cross-examination, C.L. denied telling the police that he could not identify his attacker when he was interviewed at the scene shortly after the attack. He explained, "I actually couldn't talk at the time, because I was stabbed in my lung, I couldn't talk, I was losing breath. So, I actually didn't tell them anything." On redirect examination, C.L. said that the defendant did not call him on the day of the incident. He also said that the defendant cocked his gun and pointed it at him when he was tied up, but the gun did not discharge.

M.J.L., who was a high school senior at the time of the incident, testified that, on that day, she got out of school at 2:15 p.m. and ran a few errands before going home. When she arrived, she noticed that her mother's car was still there, even though she should have been at work, and that no lights were on in the house. M.J.L. entered the house and walked to her grandmother's bedroom. She opened the door and saw her brother, C.L., sitting on the floor with a shirt tied around his mouth and clothing bloody. She screamed, and C.L. told her "through the shirt" to get out of the house. She turned around and saw the defendant coming down the hallway with a gun. She noted that she had seen the defendant two or three times prior to that day and recognized him. She identified him in court as the perpetrator.

M.J.L. testified that she turned to run but fell and that the defendant caught her at the front door. He told her to "shut up" or he would kill both her and her mother. She saw C.L. untie himself and charge at the defendant. C.L. and the defendant began fighting, and M.J.L. hit the defendant in the head. She saw her naked mother coming from the back of the house with a hammer. C.L. pushed the defendant out the front door, and they continued to fight. The defendant rolled off the porch "and was like, okay, I'm gone." C.L. collapsed on the

stairs, and her mother collapsed on a chair in the living room. M.J.L. called 911 and also went to a neighbor's house to get help. She checked on her grandmother, whom she found lifeless lying in the bathroom with a bandana around her neck and with her feet bound.

Vella Powell, the victims' neighbor, testified that she went to the victims' house to offer assistance. She administered CPR to F.G. even though it sounded like she was not breathing. F.G. had a bandana around her neck.

Chad Smart and Robert Mabe, firefighter paramedics with the Memphis Fire Department at the time of the incident, were among the paramedics who responded to the scene. Smart was assigned to care for F.G., whom he determined to be dead in the bathroom. She had a blue bandana wrapped tightly around her neck, apparently strangling her. Mabe was assigned to care for C.L., who "had a very serious set of injuries," including a life-threatening stab wound to his upper chest that penetrated through the chest wall into the space for the heart and lungs. Mabe noted that such an injury could lead to death within two to five minutes if untreated. He said that C.L. was transported to the trauma unit at the Med in critical condition.

Jeffrey Garey, a crime scene investigator with the Memphis Police Department, photographed and processed the scene, as well as collected evidence. One piece of evidence collected from the scene was a Mossberg shotgun. Officers discovered a shotgun round of the incorrect gauge jammed inside the barrel of the gun, which caused it to misfire.

Officer Jimmy Moore with the Memphis Police Department responded to the scene. He spoke to M.J.L., who told him that the perpetrator was a friend of her brother, but she did not know his name. He tried to obtain the suspect's identity from C.L. but did not get a name.

Detective Tim Reynolds with the Memphis Police Department also responded to the scene and noted that a crowd was gathering. Some of the people in the crowd told Detective Reynolds that the defendant was responsible and that he drove a white pickup truck. Someone also gave Detective Reynolds the defendant's cell phone number. Detective Reynolds ran the information through the police database and located the defendant. The next day, Detective Reynolds called the defendant on his cell phone and told him that they needed to talk to him. Officers went to the defendant's address, but he left before they arrived. The defendant's mother assisted officers in locating the defendant, and he finally turned himself in. Officers took the defendant and his mother to the police station and, during the drive, Detective Reynolds heard the defendant explaining his side of the story to his mother. The defendant told her that F.G. was having a heart attack and he put a pillow under her head.

-8-

On cross-examination, Detective Reynolds acknowledged that the defendant also told his mother that he and C.L. got into a fistfight over a debt. The defendant said that C.L. pulled a shotgun on him and pulled the trigger, but the gun did not go off. The two then fought each other with knives.

Sergeant Anthony Mullins, a homicide detective with the Memphis Police Department, testified that he was involved in the investigation of the case. As part of his involvement, Sergeant Mullins interviewed the defendant at the police station the day after the incident, after advising him of his rights. The officers asked the defendant if he wanted to talk to them, and he said that he did.

Sergeant Mullins recalled that the defendant told them "a long story about what happened leading up to this event." However, they did not take a formal statement from the defendant because, "[d]uring the course of the interview, . . . [the defendant] said he didn't have anything else to say to us without his attorney." Upon the defendant's request for an attorney, the officers stopped the interview and then, with belief that they had probable cause, booked him into jail on a forty-eight-hour hold.

On cross-examination, Sergeant Mullins acknowledged that the defendant told him that he and C.L. had been friends since 2001 and were involved in dealing drugs together. According to the defendant, he fronted C.L. some drugs four or five days before the incident and a disagreement developed over money. On the day of the incident, he knocked on the door to C.L.'s house, and C.L. let him in. A shotgun was offered as a trade for the money owed between the two, but that was not accepted and they got into a fistfight. They fought around the house, and C.L. got a shotgun and pointed it at the defendant. The defendant grabbed a knife and defended himself. C.L.'s mother then got involved, with a hammer. Thereafter, the defendant heard F.G. complaining about her heart, so he got a pillow and put it under her head and she lay down on the bathroom floor.

On redirect examination, Sergeant Mullins reiterated that the defendant admitted being in the house and stabbing C.L. and M.L. but claimed that he did so in self-defense.

Sergeant Vivian Murray testified that she was the case coordinator on the case and recalled that the defendant was originally brought to the office on December 10, the day after the incident, and spoke with two other investigators. She first came into contact with the defendant on December 11 when she and Lieutenant Mason interviewed him, after advising him of his rights. The defendant then gave a statement.

At the beginning of his statement, the defendant acknowledged that, the previous day, he had agreed to speak with Sergeant Mullins and Lieutenant Mason without an attorney but

then, during the interview, decided that he wanted to speak with an attorney and the officers stopped the interview. He further acknowledged that, on the present day, he informed Deputy Jailer Robinson that he wanted to speak with the detectives and was brought to an interview room where he was again advised of his rights and agreed to speak with the officers without an attorney.

In his statement, the defendant admitted that he was responsible for F.G.'s death and the injuries to M.L. and C.L. He acknowledged that he had known C.L. since 2001 and said that he was at C.L.'s house because C.L. owed him money. On that day, he knocked on the door and C.L. answered it. He and C.L. began arguing about money and "who owed who." C.L. "got aggressive" and punched him, sparking a fight.

The defendant stated that they separated and that he began going through drawers looking for money. He heard the shower turn off and heard M.L. call C.L.'s name. He then turned and saw that C.L. had a gun pointed at him. He said that C.L. pulled the trigger, but the gun did not fire, so he grabbed a knife and began stabbing C.L. Thereafter, he stabbed M.L. when she tried to attack him with a hammer. He bound C.L.'s and M.L.'s hands and attempted to put something around M.L.'s mouth to keep her from yelling. He heard F.G. yelling and grabbed a bandana and wrapped it around her mouth. He was putting something around C.L.'s mouth when he heard F.G. yelling again. He went into the bathroom to retie the bandana around F.G.'s mouth but, when he heard M.J.L. screaming, "pulled the bandana ends too tight real fast." He left the bathroom, and M.J.L. saw him so he picked up the gun and ran for the front door. As he was running, C.L. came around the corner behind him and tried to tackle him. He then thwarted M.L.'s attempt to hit him with a hammer. He broke free, ran out the door, and escaped.

The defendant said that, when he stabbed M.L., "she was kind of running through the house naked." He also said that he bagged up the clothes he was wearing during the incident and threw them into the back of a stranger's truck. He acknowledged that he was treated fairly during the investigation and that he gave his statement freely and voluntarily. He said that he told each of the victims that he did not want to kill them and that he gave F.G. a pillow because her chest was hurting.

Sergeant Murray testified that, after the defendant gave his statement, he was arrested and charged with murder.

Medical examiner, Dr. Lisa Fuente, performed an autopsy on F.G. She determined that the cause of death was ligature strangulation from the bandana that "was very tightly encircling her neck."

**Defendant's Proof at Trial**

Rachael Geiser, a private investigator for the defense, testified that the defense team went to the medical examiner's office and interviewed Dr. Fuente about the autopsy. She said that they reviewed autopsy and crime scene photos, as well as the autopsy report. They did not review any tissue samples because Dr. Fuente told them that none were taken.

Dr. O'Brian Cleary Smith, a forensic pathologist, testified regarding alternate means by which F.G. could have died, as well as posited a theory that the petechiae located on her body could have been caused by her medications. Dr. Smith was of the opinion that the autopsy performed by Dr. Fuente did not conform to the lowest level of medically acceptable proof. On cross-examination, Dr. Smith acknowledged that he could not say that F.G. did not die of ligature strangulation. He admitted that he was asked to leave the medical examiner's office in 2004.

**Rebuttal Proof**

Dr. Fuente stated that the petechiae noted on F.G. was not post-mortem petechiae. Regardless, she thought the presence of "a tight ligature encircling [F.G.'s] neck" was the "significant thing," not the presence or absence of petechiae. She said that petechiae was typically seen in only a minority of cases; often "the only thing that's present is a ligature." Dr. Fuente did not think it would have made any difference had Dr. Smith looked at tissue samples.

Following the conclusion of the proof, the jury convicted the defendant of four counts of first degree felony murder, one count of reckless homicide as a lesser-included offense of first degree premeditated murder, two counts of attempted first degree murder, one count of aggravated rape, one count of aggravated sexual battery as a lesser-included offense of aggravated rape, six counts of especially aggravated kidnapping, and two counts of especially aggravated burglary. The jury acquitted the defendant on one count of especially aggravated burglary. The trial court merged the following convictions: the four felony murder and the reckless homicide convictions into one felony murder conviction; the aggravated sexual battery conviction with the aggravated rape conviction; the six especially aggravated kidnapping convictions into three convictions, one per victim; and the two especially aggravated burglary convictions into one conviction.

## ANALYSIS

### I. Motions to Suppress

Prior to trial, the defendant filed motions to suppress his statement to police and the photographic identification of him. He argued that his statement should have been suppressed because he was improperly questioned after invoking his right to counsel and ultimately was coerced into giving a statement because the police threatened to arrest his girlfriend and mother. He argued that the photographic array from which the witnesses identified him was unduly suggestive because the background of his photograph was lighter than the background of the other photographs.

On February 19, 2010, the trial court conducted a hearing on the defendant's motions. At the hearing, Sergeant Vivian Murray, a homicide detective with the Memphis Police Department, testified that the defendant was developed as the suspect in the case and brought to the homicide office by Lieutenant Barham. Sergeant Murray identified the advice of rights form that she discussed with the defendant and he signed on December 11, 2008, at 7:25 p.m. before giving his statement.

Sergeant Murray also identified another advice of rights form dated December 10, 2008, indicating that the defendant was advised of his rights by Sergeant Mullins and Lieutenant Mason. On that form, the defendant indicated that he had a tenth grade education. Sergeant Murray explained that a suspect is advised of his rights before each time he is interviewed, although she was not sure why the defendant was interviewed twice. She said the defendant may have been interviewed by Sergeant Mullins and Lieutenant Mason, but there was no typed supplement of any interview conducted on December 10. She also said that it was normal to interview a witness and then take a formal statement if the individual agreed to give one.

Sergeant Murray testified that the defendant agreed to give a statement on December 11, did not ask for an attorney, and appeared to understand what was happening. She informed the defendant of the possible charges against him, and he seemed to understand. He spoke with her voluntarily, and she reviewed his rights again at the start of the statement. Sergeant Murray stated that the eight-page statement was taken in the robbery office by herself and Lieutenant Mason. The defendant was not deprived of food or bathroom breaks, and he was not threatened with any harm to his mother or girlfriend. He did not hesitate in answering questions.

Sergeant Murray testified that she reviewed with the defendant all of the charges he faced, and he understood them. After giving the statement, the defendant was allowed to make handwritten corrections, and then he signed and initialed the statement. Sergeant Murray testified regarding what she could remember of the substance of the defendant's statement. She confirmed that at no point during the giving of the statement did the defendant request an attorney. She did not threaten him at any time to get him to say what

he said in his statement. She said that the defendant's statement was corroborated by evidence at the scene.

On cross- and recross-examination, Sergeant Murray denied that Rimilia Taylor was in the homicide office, handcuffed to a table, when the defendant gave his statement. She said that the defendant was not provided an attorney after he advised that he wanted to speak with one during the interview on December 10, but the interview stopped immediately. Sergeant Murray stated that the defendant was arrested and placed on a forty-eight-hour hold on December 10, 2008, at 12:40 p.m. as a suspect in a homicide but was not formally charged at that point. She prepared an affidavit of complaint and swore to the facts stated in it before a commissioner on December 12.

Sergeant Murray identified copies of the photographic array from which the witnesses identified the defendant. She noted that the defendant's picture "in black and white is lighter than the other pictures" in the array. She agreed that his picture was noticeably lighter but said, "This is a black and white copy. I don't know if there was anything going on with the printer. The actual photo spread should ha[ve] been in color. So I . . . would have to see that to see if it's that much of a difference."

Sergeant Murray testified that the probable cause to arrest the defendant came from C.L.'s telling officers, when he was questioned while in the hospital, that the defendant was the person who attacked his family. She stated that, after this, Lieutenant Mason contacted the defendant's mother in an attempt to locate the defendant. Sergeant Murray testified that the day after the defendant's invocation of his right to an attorney, officers were informed by "deputy jailer Robinson" that the defendant "wanted to speak with someone in homicide." She said that the defendant was questioned on December 11 only because he "made it aware that he wanted to speak with [them]."

Rimilia Taylor, the mother of the defendant's child, testified that she and the defendant were in a relationship on December 10, 2008. She said that, shortly after the defendant turned himself in, officers requested that she come to the police station for questioning. Taylor claimed that the officers kept her in a small room, chained by her ankle to a bench that was nailed to the floor, for eleven hours. She was two and a half months pregnant at the time. She recalled that the officers opened the door and brought the defendant by the room, and she heard the defendant telling them that they should let her go. While the defendant was standing in the door, the officers told her that she was "going to jail too, you'[re] accessory." The officers had her sign something they claimed were her "arrest papers." However, they did not arrest her.

Taylor testified that the police allowed he to see the defendant one more time before

she left. She said that it had been five or six hours since she saw him last. Officers told her that they were going to bring the defendant's mother in for questioning if needed.

On cross-examination, Taylor acknowledged that the police advised her of her rights and that she never told the police she did not understand her rights or what was happening. Taylor claimed that she spoke with Sergeant Murphy[2] and another woman and that they threatened that her children would enter the Department of Children's Services' custody if she went to jail. She said she had no information about the defendant's crimes or where he was on December 9. She knew nothing about what the defendant said in his statement to police.

On redirect examination, Taylor identified an advice of rights form that she signed on December 11 at 12:25 p.m. She said that she arrived at the police station at 11:30 a.m. and left at approximately 11:50 p.m. She stated that she was still in custody, chained by her ankle to a table, at 9:25 p.m. when the defendant evidently gave his statement. She recalled that the police sent her father home around 1:00 p.m., saying they would call him when they were finished questioning her.

Patrina Wilson, the defendant's mother, testified that she drove the defendant to the police station to be questioned and was advised not to wait because "they were going to take awhile with him." Wilson went home but talked to Sergeant Murray later that night by telephone. She said that Sergeant Murray never threatened her directly, but the defendant told her that the police were coming to arrest her. However, she was not certain of the exact date of this conversation with the defendant, and no one ever came to arrest her. She recalled that the defendant told her that he gave and signed a statement on December 11, but he was brought back the next day to resign the statements because he had not "sign[ed] all the documents."

On cross-examination, Wilson stated that the defendant told her that "he had gotten into it with his friend Chris . . . and he had actually stabbed Chris." She brought the defendant to the police station because he wanted to tell his side of the story. Wilson said she never contacted an attorney.

The twenty-three-year-old defendant testified that his mother brought him to the police station around noon on December 10. He was told that he was not under arrest but was coming in for questioning. When he arrived, he was met at the elevators by Lieutenant Caroline Mason and Sergeant Tony Mullins, who took him to an interview room, put an ankle bracelet on him, and left him sitting in the room for thirty or forty minutes before

---

[2] We assume Taylor meant Sergeant Murray, not Murphy.

coming to speak to him.

The defendant testified that he signed an advice of rights form and expected to give a statement immediately, but Sergeant Mullins began trying to "coerce" him and give him details about the case. He asked for an attorney because Sergeant Mullins was making him feel "uncomfortable" and telling him, "[Y]ou did this." He said that the officers would leave for a couple of hours and then come back in. He "kept telling [them] [he] want[ed] to talk to [an] attorney."

The defendant recalled that the officers told him that other officers had gone to the hospital and taken statements from M.L. and C.L. After the statements came back, the officers asked him if he was ready to go to intake and took his shoes. As he was being booked, Lieutenant Mason gave him a card with her telephone number on it in case he changed his mind and wanted to talk. He was afforded the opportunity to make a fifteen-minute phone call and called his mother. However, he did not know the number of an attorney to call and did not know what offense he was charged with at the time.

The defendant testified that, when he woke up the next day, he was told he had a visit from detectives, so he talked to Officer Robinson who told him that two detectives were coming to see him. He denied telling Officer Robinson or anyone else at the jail that he wanted to talk. He said that he told Sergeant Murray and the officer with her that he wanted to speak with an attorney. However, the officers brought him to the homicide floor and showed him Rimilia Taylor chained up in a room. He claimed that he asked the officers if they wanted him to say that he had committed the crimes, and they responded, "[T]he truth's on you." He again asked to speak with an attorney but was denied.

The defendant testified that he was taken to an interview room in the robbery office. He asked if he could be provided with a public defender, but Sergeant Murray told him that an attorney was not going to be appointed "at this time of night." He was also told that he could not talk to his mother "until after you give us what we want." He recalled that the officers told him, "[W]e got your girl, we're fixing to go get your mom too. We got a squad car on the way there right now." He said that he felt he had to cooperate and give a statement. He said the majority of the statement was made up. However, he acknowledged that he told his mother that he got into a fight with and stabbed C.L., which was a true statement.

On cross-examination, the defendant acknowledged that he signed the advice of rights form on December 10 but said he did so because the officers were not exerting pressure on him at the time. He admitted that he was aware of his rights, having been through the criminal justice system before. However, when the actual questioning began, he asked for

an attorney. He was taken from the homicide office to the jail and called his mother. However, he did not ask her to call an attorney because they did not have the money to hire one.

The defendant claimed that he did not sign the second advice of rights form, the one given on December 11, voluntarily because he was forced to choose between Rimilia Taylor's freedom and going to jail himself. He denied that the initials, signature, and corrections on the statement were his. He then attempted to clarify that he did sign and initial some pages on December 11, but not the exact eight-page document presented at the suppression hearing which was a document that had been "reprinted" by an officer on the 12th. He acknowledged that his statement on the 11th was "basically the same thing" as the December 12 statement but that the officers had "broke[n] it down into individual questions," and he refused to sign the new document. He maintained that the information in the statement was nevertheless untrue because he had been coached on what to say.

The defendant denied responsibility for F.G.'s death, explaining that he only said he was responsible because he was under pressure. He admitted that he was responsible for M.L. and C.L.'s stab wounds. He acknowledged that the statement contained some truths. He said that the officers told him that Rimilia Taylor would be released once he finished his statement. The defendant admitted that he used Taylor's car to drive to the victims' house the day of the incident.

The motion to suppress hearing continued on May 19, 2010, and the State recalled Sergeant Murray to testify. Sergeant Murray stated that, on December 11, she called the jail to have the defendant brought up for a detective visit. She was aware that Sergeant Mullins and Lieutenant Mason had interviewed the defendant the previous day when he turned himself in, but she was not present during that interview and did not know that he had asked for an attorney during that interview. She knew that the officers had placed the defendant on a forty-eight-hour hold in the jail later that night. When the officers who interviewed the defendant the previous day came into the office, they informed her that the defendant had asked for an attorney so they could not talk to him. She called back to cancel the detective visit and was told that the defendant was in transit to Old Release but that once he arrived, he would be told the visit was canceled and sent back.

Sergeant Murray testified that, a short time later, she received a call from Deputy Jailer Robinson, telling her that the defendant was in Old Release for the detective visit. She told Deputy Jailer Robinson that she had called to cancel the detective visit because the defendant had requested an attorney. However, Deputy Jailer Robinson told her that the defendant wanted to talk with them, so they went down and got the defendant. Prior to talking to him, the officers read the defendant his rights again, specifically referring to the

fact he had previously requested an attorney and ensuring whether he still wanted to talk. Sergeant Murray stated that the defendant wanted to talk, so they questioned him. The defendant gave a statement, implicating himself in the crimes.

On cross-examination, Sergeant Murray testified that she did not recall what time she left for the day on December 10, the day the defendant invoked his right to an attorney during his interview with Sergeant Mullins and Lieutenant Mason. She said she did not give instructions to the officers during the time they were talking to the defendant. Asked how she was able to recall her conversation with Deputy Jailer Robinson on December 11 if it was not noted in her supplement, Sergeant Murray explained, "I remembered the conversation. Some things about certain cases just stand out to you, you just remember certain cases and then some things." Sergeant Murray said that the officer in Old Release when she picked up the defendant on December 11 was an African-American female, whom she believed to be Deputy Jailer Robinson.

Sergeant Murray testified that she called Rimilia Taylor and asked her to come into the office on December 11, but she did not know what time Taylor arrived or how long she was there. She said that Taylor was in an interview room, but she did not "remember her being shackled at all." She stated that Taylor was brought in to verify an alibi given by the defendant. She thought she spoke with Taylor, but she could not remember any specific questions that were asked. After reviewing Lieutenant Mason's supplement, she recalled that both she and Lieutenant Mason spoke with Taylor and that Taylor was in the homicide office for "a little over four hours." However, she could not recall when Taylor was actually released. Sergeant Murray acknowledged that the background of the defendant's photograph in the array shown to the witnesses was different than the background for the other five individuals in the array. However, she did not think the array was suggestive.

On redirect examination, Sergeant Murray stated that Taylor was never in custody or arrested, nor was she shackled or handcuffed. Sergeant Murray noted that the defendant, in his statement, confirmed that he told Deputy Jailer Robinson that he wanted to speak with the detectives.

Lieutenant Caroline Mason with the Memphis Police Department testified that she and Sergeant Mullins interviewed the defendant on the day he turned himself in to the police, December 10, 2008. Sergeant Murray was present and directed them to interview the defendant, but Sergeant Murray did not come into contact with the defendant. The defendant was read his rights and appeared to understand them. The defendant indicated, without any force or coercion, that he wanted to talk to them and did not indicate that he wanted an attorney.

Lieutenant Mason testified that the defendant first told them that F.G. had not been stabbed. The officers had not mentioned who the victims were at that point. The defendant acknowledged that he knew C.L. and had stopped by his house with regard to a debt. He told the officers that he and C.L. got into a struggle, which spilled into other rooms of the house. Feeling like C.L. was "getting the best of him," the defendant picked up a knife to try to defend himself. He said that, by this point, C.L.'s mother also started to attack him, so he stabbed her in self-defense. He also said that he heard a "thump" from F.G.'s bathroom, as though she may have fallen, and tried to render aid. The defendant told them that he had to tie up C.L. to keep from being attacked and, after M.J.L., C.L.'s sister, arrived, he had to break away and escape.

Lieutenant Mason testified that the defendant appeared to know the layout of the victims' house and told them that he went there three or four times a week. She said that the defendant "was quite a talker" and that "[i]t was kind of like he wanted to . . . get it off his chest." However, she recalled that, when she and Sergeant Mullins started asking the defendant questions, he asked for an attorney and the interview stopped. They booked the defendant into jail on a forty-eight-hour hold. They did not talk to Sergeant Murray during any of this.

Lieutenant Mason testified that, when she arrived at work the next day, she learned that Sergeant Murray had ordered a detective visit with the defendant, as she had not been present when the defendant requested an attorney the previous night. Upon learning this, Sergeant Murray called and canceled the interview, but someone called back to say that the defendant wanted to speak with them. Lieutenant Mason said that she was present when the defendant was brought up, read his rights, and gave a statement. She recalled that the defendant said that he wanted to talk and that Sergeant Murray went over with him that he had asked for an attorney but now said that he wanted to talk. Lieutenant Mason said that she was present when the defendant was asked whether he had told Deputy Jailer Robinson that he wanted to speak with the detectives, and the defendant implied that he had. She was also present when the defendant signed and initialed his statement. Lieutenant Mason stated that she showed a photographic array to M.J.L. who identified the defendant without hesitation.

On cross-examination, Lieutenant Mason acknowledged that she and Sergeant Mullins put Rimilia Taylor in an interview room and questioned her. However, she did not know how long Taylor was in the interview room. She said that the defendant told them that he had given Taylor some clothing to get rid of, which possibly implicated her as an accessory after the fact.

On redirect and recross examinations, as well as examination by the court, Lieutenant

Mason testified that Taylor was not under arrest or not free to leave. Taylor was not shackled, and her presence was not used to threaten or coerce the defendant. Lieutenant Mason did not know what time Taylor left the homicide office. Lieutenant Mason stated that Sergeant Murray could have shackled Taylor, but she maintained that Taylor was not shackled. She said that, even though the door to the interview room was closed and locked, Taylor could have asked to leave but did not. She stated that the defendant and Taylor were never allowed to see or speak to each other while Taylor was at the police station. Lieutenant Mason said that no statements were made to the defendant that they were going to arrest his mother, and she did not consider placing Taylor under arrest.

Officer Evelyn Robinson, a deputy jailer at the Shelby County Jail, testified that she was working at the jail on December 10 and 11, 2008, but she did not have an independent recollection of those days. She did not recall any conversation with the defendant. She said that, if an inmate did not want to leave the facility, he did not have to, even if the police wanted to talk to him.

Lieutenant Bart Ragland with the Memphis Police Department testified that he was directed to compile a photographic array in this case. He testified concerning the process for creating an array and that the goal was to find photographs that are "similar and alike" to the suspect. He acknowledged that the background of the defendant's picture was a little lighter than the background behind the other individuals but explained "[t]hat's the way the photos were taken that day or the way that this person's photo turned out." He said that the backgrounds sometimes looked different on the computer screen than when printed. He denied trying to draw attention to the defendant's photograph, as his intention was to create as "unbiased" array as he could. He stated that his emphasis in compiling an array was on the physical attributes of the subjects rather than the background of the photographs. He said that he rejected other photographs of the defendant because they contained attributes that would have unnecessarily drawn attention to them.

Sergeant David Parks, a homicide investigator with the Memphis Police Department, testified that he showed a photographic array to C.L., who immediately identified the defendant as the man who stabbed him. Sergeant Parks acknowledged that the background of the defendant's photograph was obviously lighter than the backgrounds of the other photographs in the array. He said that he showed C.L. the array as a formality or "extra step," even though C.L. knew the perpetrator. He showed the array to M.L. as well, and she immediately identified the defendant "as the person who harmed her."

Sergeant Parks testified that he took a statement from M.L. and that she said she knew the perpetrator but did not know his name. He also took a statement from C.L. who told him that the defendant was responsible for F.G.'s death. Sergeant Parks acknowledged that he

memorialized in the written supplement of his interview of C.L. in the hospital that C.L. said that he did not know who was responsible for F.G.'s death. Sergeant Parks said that "it was obvious that he didn't want to tell what had happened. . . . It was obvious he knew and he wanted to get revenge himself."

The motion to suppress hearing continued on June 18, 2010, and the State first called C.L. to testify. C.L. stated that he had known the defendant since 2002 or 2003 and that he saw him once every two or three months. He said that he identified the defendant from a photographic array while he was in the hospital and that there was no doubt in his mind that the defendant was the perpetrator. No one suggested someone or told him whom to pick out of the array. C.L. acknowledged that he initially told the police he did not know who stabbed him but explained that he was distracted trying to get medical attention for his stab wounds.

C.L. testified that the defendant had visited his house socially four or five times and had met his sister but not his mother. He clarified that his sister had "seen [the defendant's] face a couple of times . . . [but] [t]hey never officially met each other," and his sister did not know the defendant's name. With regard to the day of the incident, C.L. stated that he did not realize that the defendant was the intruder at first but that he recognized both the defendant's voice and face during their altercation. He said that he did not recognize the defendant at first because the house was dark and he could not see. C.L. estimated that the defendant was in his presence for approximately thirty minutes that day. He again admitted that he initially told the police, while waiting on the porch for an ambulance, that he did not know who was responsible for the attack.

M.J.L. testified that she recognized the defendant as the perpetrator "as soon as [she] saw him," because he was friends with her brother. She said that daylight was coming in the windows, allowing her to see the defendant's face clearly, even though no lights were on inside the house. She had seen the defendant "around" a lot and recognized him immediately. She knew the defendant's name but "would get his name confused." Police officers showed her a photographic array, from which she identified the defendant.

M.L. testified that she was able to see the perpetrator's face when he took off his coat. She said that she was in the house with him from about 12:30 p.m. until after 3:00 p.m. and that he took his coat off after about two hours. She did not know the defendant prior to the incident but was able to see him throughout the ordeal. She said that the light was on in the bathroom so that she could see the defendant clearly. The police showed her a photographic array, from which she identified the defendant as the person who attacked her. She said that the only reason she picked the defendant out of the array was because she recognized him as her attacker. On cross-examination, she acknowledged that the background of the defendant's photograph was much lighter than the backgrounds of the other photographs.

Following the conclusion of the hearing, the trial court entered an order denying the defendant's motions. On appeal, a trial court's findings of fact regarding a motion to suppress are conclusive unless the evidence preponderates against them. State v. Reid, 213 S.W.3d 792, 825 (Tenn. 2006) (citing State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001)). Any question about the "credibility of witnesses, the weight and value of the evidence, and a resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). Thus, unless the defendant demonstrates that "the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court." Reid, 213 S.W.3d at 825 (citing State v. Cribbs, 967 S.W.2d 773, 795 (Tenn. 1998)). However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

## A. Statement

Again, the defendant argues that his statement should have been suppressed because he was improperly questioned after invoking his right to counsel and ultimately was coerced into giving a statement because the police threatened to arrest his girlfriend and mother.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). The State has the burden of proving the waiver by a preponderance of the evidence at the hearing on the motion to suppress. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his Miranda rights, courts look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). If a suspect invokes his right to counsel under the Fifth Amendment, he or she "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). Our supreme court has concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). In order for a confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Courts look to the totality of the circumstances to determine whether a confession is voluntary. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

As to whether the defendant was improperly questioned after invoking his right to counsel, the court found that the defendant's statement was "knowingly and voluntarily given after [the] defendant re-initiated contact with police; revoked his previous invocation of his right to counsel; and, voluntarily waived his rights." The defendant testified that Sergeant Murray initiated the discussions on December 11, 2008, and that he had not asked to speak with officers that day. However, the court specifically found that the defendant's credibility was "highly suspect" and resolved conflicts in the testimony against the defendant.

The trial court observed, and the record shows, that both Sergeant Murray and Lieutenant Mason testified that Sergeant Murray canceled the scheduled detective visit after learning that the defendant had invoked his right to counsel the previous evening but that Sergeant Murray was subsequently contacted by jail personnel informing her that the defendant wanted to speak with them. Both officers testified that the defendant was again advised of his rights and voluntarily waived those rights. The contents of the defendant's statement include an acknowledgment that the defendant initiated the contact. The court noted that Sergeant Murray's testimony was at sometimes "confused" and that she did not seem to have a good recollection of the case, but that Lieutenant Mason had "a good recollection of the details of the investigation" and that her testimony was entitled to "substantial credit." The question of whether the defendant initiated the discussions with the officers after invoking his Miranda rights the previous day turns on the court's determination of the credibility of the witnesses. The trial court resolved conflicts in the testimony against the defendant. We will not second-guess this determination and, therefore, conclude that the defendant is not entitled to relief on this issue.

With regard to his claim of coercion, the defendant testified that the officers showed him Rimilia Taylor, his girlfriend at the time, shackled to a table in an interview room, and also threatened to arrest his mother. He stated that he only gave a statement, which he claimed to be in large part made up, because he felt that he had to choose between going to

-22-

jail himself and Taylor's freedom. He said that his repeated requests for an attorney were ignored. Taylor testified that she was held in an interview room with her ankles shackled for eleven hours and that the defendant was paraded by her interview room and told that she was going to jail. The defendant's mother, Patrina Wilson, testified that the defendant told her at some point that the police had told him they were going to arrest her, but she was never arrested or threatened with arrest by any officers.

Sergeant Murray testified that the defendant was not threatened with any harm to his mother or girlfriend. She said that Taylor was in an interview room but was not shackled. Lieutenant Mason testified that Taylor was not shackled and that her presence was not used to threaten or coerce the defendant. She said that no statements were made to the defendant that they were going to arrest his mother, and she did not consider placing Taylor under arrest. She stated that the defendant and Taylor were never allowed to see or speak to each other while Taylor was at the police station. She explained that the defendant told them that he had given Taylor some clothing to get rid of, which possibly implicated her as an accessory after the fact. Lieutenant Mason stated that, on December 11, the defendant did not indicate that he wanted an attorney.

As to this issue, the court noted that it did not question Lieutenant Mason's recollection of the events and did not "find Taylor's testimony particularly credible." It also did not find the defendant's testimony regarding Taylor and his mother "particularly credible" in light of Sergeant Murray's and Lieutenant Mason's testimony. The court concluded that it did not find the "defendant's claims that his confession was the subject of coercive tactics by the police to be credible." We will not second-guess the credibility determinations of the trial court and, therefore, conclude that the defendant is not entitled to relief on this issue.

Moreover, the trial court also noted that, even had the police told the defendant that Taylor might be charged, such was not unconstitutionally coercive because the officers had at least probable cause to charge Taylor as an accessory after the fact. The evidence supports this finding. Threats to arrest members of a suspect's family may cause a confession to be involuntary, but the question turns upon whether the threat could have been lawfully carried out. See, e.g., United States v. Johnson, 351 F.3d 254, 262-263 (6th Cir. 2003). Here, the defendant told the police that he had given Taylor some items of clothing to dispose of. An accessory after the fact is one who, with knowledge or reasonable ground to believe that the offender has committed a felony, provides or aids in providing the offender with any means of avoiding arrest. See Tenn. Code Ann. § 39-11-411(a). Thus, the defendant's confession was not coerced by any threat to arrest Taylor, even had there been such threat.

Furthermore, even if the court erred in not suppressing the defendant's statement, such

error was harmless beyond a reasonable doubt. The jury heard testimony from three witnesses, all of whom identified the defendant as the perpetrator and one of whom had known the defendant socially for several years. Accordingly, this issue is without merit.

## B. Photographic Identifications

The defendant argues that the victims' identification of him from a photographic array should have been suppressed because the array was unduly suggestive in that the background of his photograph was lighter than the background of the other photographs.

Each officer acknowledged that the background of the defendant's photograph was lighter than the other photographs in the array. Lieutenant Bart Ragland, who created the array, testified that he went through one to two hundred photographs before choosing the photographs to include in the array. He said that his emphasis in compiling an array was on the physical attributes of the subjects rather than the background of the photographs and that his intention was to create as "unbiased" array that he could. He rejected one or two other photographs of the defendant because of attributes that would have drawn attention to the defendant.

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive and (2) gives rise to a "very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). In Neil v. Biggers, 409 U.S. 188, 199 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. Id. If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Id. (internal quotations omitted); see also Stovall v. Denno, 388 U.S. 293, 302 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it").

The factors to be considered in evaluating the reliability of an identification obtained as part of a suggestive identification procedure include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. See Biggers, 409 U.S. at 199-200. The corrupting effect of the suggestive procedure is weighed against these factors. See Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

There is, however, no need for the court to apply the totality of the circumstances test outlined in Biggers if it first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification. See State v. Biggs, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted).

"Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from 'suggestive identification procedures.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Biggers, 409 U.S. at 196). Accordingly, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" Id. (quoting Stovall, 388 U.S. at 301-02). The risk of irreparable mistaken identification is heightened if one of the photographs in the photographic lineup "is in some way emphasized," or if "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Simmons, 390 U.S. at 383.

The trial court reviewed the photographic arrays that were shown to the witnesses and determined that they were not "so unnecessarily suggestive as to preclude either the admission of the photographic line-ups at trial or any in-court identification by the witnesses." However, the court also reviewed the Biggers factors and determined that the identifications should be admitted.

We have likewise reviewed the photographic array in question and note that the background of the defendant's photograph is noticeably lighter, albeit perhaps not as stark as the defendant suggests. Regardless, we conclude that the trial court did not err in ruling not to suppress the photographic identifications because the totality of the circumstances shows that the identifications were reliable.

The record shows that each victim had ample opportunity to view the defendant at the time of the crime. The victims' testimony made clear that they were attentive for at least portions of the incident, conversing with the defendant and struggling with him face-to-face. The record also shows that the victims' prior descriptions of the assailant were accurate and that one of the victims knew the defendant prior to the incident and another victim had previously met the defendant. The record further shows that the victims immediately, and with certainty, identified the defendant from the array and that the length of time between the crime and the confrontation was within hours. The record does not preponderate against the trial court's finding that the totality of the circumstances shows that the identifications were reliable.

## II. Jury Charge

The defendant argues that the trial court failed to properly instruct the jury on especially aggravated kidnapping. He asserts that the court did not charge the jury in line with State v. White, 362 S.W.3d 559, 578 (Tenn. 2012).

In White, the Tennessee Supreme Court ruled that "trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." Id. The court emphasized that it was not creating a new standard for kidnapping but instead was "merely providing definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty" and, thus, that its ruling in the case did not "articulate a new rule of constitutional law or require retroactive application." Id. To provide guidance, our supreme court set forth the following instruction to be issued by trial courts until an appropriate pattern jury instruction is developed:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;
>
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;
>
> • whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
>
> • whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have

-26-

succeeded in this objective; and

> • whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580-81 (footnote omitted).

Although White was decided after the trial in this case and the defendant, therefore, neither requested nor received the jury instructions mandated by that case, our supreme court has clarified that retroactive application was intended with respect to cases that were already in the "appellate pipeline" at the time White was decided. See State v. Cecil, 409 S.W.3d 599, 608 (Tenn. 2013). The defendant's case falls into this category.

The opinions of several panels of this court have indicated that before a case should be retried due to the failure to give a White instruction, there should be an analysis to determine whether the error was harmless beyond a reasonable doubt. See, e.g., State v. Curtis Keller, No. W2012-00825-CCA-R3-CD, 2013 WL 3329032, at *4-5 (Tenn. Crim. App. June 27, 2013); State v. Jonathan Kyle Hulse, No. E2011-01292-CCA-R3-CD, 2013 WL 1136528, at *14 (Tenn. Crim. App. Mar. 19, 2013), perm. app. denied (Tenn. Aug. 12, 2013); State v. David Earl Scott, No. E2011-00707-CCA-R3-CD, 2012 WL 5503951, at *13-14 (Tenn. Crim. App. Nov. 14, 2012), perm. app. denied (Tenn. Mar. 5, 2013).

We conclude that the evidence in this case overwhelmingly shows that the victims' removal or confinement went beyond that necessary to accomplish any of the underlying felonies. Similarly to the scenario in Curtis Keller, where the court concluded that the instructional error was harmless beyond a reasonable doubt because it was "clear that the movement and confinement of the victims was not done for purposes of accomplishing assaults upon them," 2013 WL 3329032, at *5, the defendant repeatedly moved, confined, and bound M.L., C.L., and F.G., at gunpoint, before and after and in a manner unnecessary to commit the other offenses against them. In addition, had the jury been given the White instruction, it would have been told to consider, among other things, the nature and duration of the victims' removal or confinement by the defendant; whether the removal or confinement occurred during the commission of the separate offenses; whether the interference with the victims' liberty was inherent in the nature of the separate offenses; and whether the removal or confinement prevented the victims from summoning assistance. Analysis of these factors, in light of the evidence recited above, leads us to conclude that the jury would not have reached a different conclusion had a White instruction been given. The omission of a White instruction was harmless beyond a reasonable doubt.

### III. Sufficiency of the Evidence

The defendant lastly challenges the sufficiency of the evidence convicting him of felony murder, attempted first degree premeditated murder, aggravated rape, and especially aggravated burglary.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

### A. Felony Murder

The defendant argues that F.G.'s death "was a senseless and tragic act" but that "there

is insufficient proof, for the reasons argued in his challenge to the sufficiency of the evidence of each offense, that he perpetrated or attempted to commit any of the alleged felonies."

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, . . . rape, . . . burglary, [or] kidnapping[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2010). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts." Id. § 39-13-202(b). The evidence shows that the incident resulted in the death of F.G., who was strangled with a bandana. This establishes the "killing of another" requirement for felony murder and, as will be shown below, the evidence also establishes that the killing occurred during the commission of attempted first degree murder, rape, burglary, and kidnapping.[3]

### B. Attempted First Degree Premeditated Murder

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2010). An intentional act requires that the person have the desire to engage in conduct or cause the result. Id. § 39-11-106(a)(18). "Premeditation" is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation is present is a question of fact for the jury, and it may be determined from the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Circumstances that may be indicative of premeditation include declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173

---

[3] The defendant does not contest the sufficiency of the evidence of his especially aggravated kidnapping convictions.

S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense" and acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a), (a)(2). Criminal attempt also occurs when the defendant "acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3).

The evidence shows that the defendant stabbed M.L. in the chest and attempted to cut her throat. Blood poured from her wounds, she lost control of her bladder and bowels, and she felt her body getting weaker and shutting down. The defendant told her that if her son arrived within fifteen minutes, he could call the paramedics to save her, implying that she would die if he did not. Previously, the defendant told M.L. that he had to kill her and F.G. because they had seen his face. M.L. also heard the defendant on the phone saying that he was "going to kill his momma and grandmomma and Chris." The defendant told M.L., just prior to trying to cut her throat, that he had to show C.L. that "I mean business[.]" After M.L. tried to reach a phone to call for help, the defendant attempted, unsuccessfully, to shoot her three times. He then told M.L. that "[she] just killed [her] son." The defendant explicitly threatened to kill C.L. before stabbing him a total of thirteen times. The defendant also tried unsuccessfully to shoot C.L. Paramedics responding to the scene determined that C.L. "had a very serious set of injuries," including a life-threatening stab wound to his upper chest that penetrated through the chest wall into the space for the heart and lungs that could lead to death within two to five minutes if untreated. The sum of this evidence, viewed in the light most favorable to the State, shows that the defendant attempted to kill M.L. and C.L. in a premeditated fashion.

## C. Aggravated Rape

Aggravated rape is "unlawful sexual penetration of a victim by the defendant or the defendant by a victim" when "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon[.]" Tenn. Code Ann. § 39-13-502(a)(1). "Sexual penetration" includes " any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." Id. § 39-13-

501(7).

M.L. testified that the defendant grabbed her head and forced her to stand, then inserted gloved fingers "up in [her] vaginal area." The defendant was carrying a gun while he did this. The defendant points out that there was no physical evidence of penetration, but such is not required for a jury conviction of aggravated rape to be upheld on appeal. See State v. Bonds, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005). The defendant also points out that M.L. told her daughter, M.J.L., that she had not been raped. However, this is only evidence that M.L. thought of the word "rape" in the lay sense, forced sexual intercourse, rather than penetration with a digit, which satisfies the legal definition of rape. In the light most favorable to the State, the evidence is sufficient to sustain the defendant's conviction for aggravated rape.

### D. Especially Aggravated Burglary

The State concedes that the defendant's conviction for especially aggravated burglary should be modified to aggravated burglary, pursuant to Tennessee Code Annotated section 39-14-404(d), because he was also prosecuted for especially aggravated kidnapping and attempted first degree murder. See State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993). We, accordingly, modify the defendant's conviction in Count 16 to aggravated burglary.

Aggravated burglary occurs when one enters the habitation of another, without consent, with the intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-401; -402; -403. The defendant asserts that the evidence fails to show that he entered the residence without the effective consent of the owner. However, the circumstantial evidence showed that the defendant entered the victims' home through a bedroom window, not the typical means of entry for one invited into another's home. M.L. testified that she wondered how the intruder got into her house and noticed that she felt a draft and saw that the window air conditioner had been removed, the curtain was halfway down, and that her night stand had been pushed away from the window and everything had been knocked off it. In the light most favorable to the State, the evidence shows that the defendant's entrance into the victims' home was non-consensual. Thus, the evidence is sufficient to sustain the defendant's conviction for aggravated burglary.

### CONCLUSION

Based on the foregoing authorities and reasoning, we remand for entry of a corrected judgment in Count 14 to reflect the sentence length of twenty years, which was omitted, and we vacate the judgment for especially aggravated burglary in Count 16 and remand for

resentencing for the modified conviction of aggravated burglary in that count.  In all other respects, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE